# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | DOCKET NOS. 19-CR-30018-DJC |
| | ) | |
| CARLOS MALDONADO | ) | |

## DEFENDANT'S CORRECTED
## REDACTED SENTENCING MEMORANDUM

Defendant Carlos Maldonado respectfully submits this memorandum to assist the Court in sentencing him.

## STATEMENT OF FACTS

Personal History

Mr. Maldonado, now 30 years old, was born in Springfield and lived his entire life in Hampden County.  Presentence Report ("PSR"), ¶ 44. ███████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████



related





Mr. Maldonado never finished high school or earned a GED. ███████████████ ████████████████████████████████████████ When Mr. Maldonado was 18, he was convicted of armed assault with intent to murder and other charges stemming from an incident in which he was not the person who fired the gun. (No one was struck or injured.) PSR, ¶ 33. Joshua Santos, one of two co-defendants, recently provided undersigned counsel with an

affidavit stating that Mr. Maldonado was not aware that he was planning to shoot the victims before he opened fire. *See* Affidavit of Joshua Santos, attached as Exhibit 1.[1]

███████████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████

    ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████

─────────────────────

[1] Based in part on this information, as well as other issues (most notably the failure of trial counsel to seek suppression of a suggestive identification), undersigned counsel filed a motion for new trial. The denial of that motion is the subject of a pending appeal in the Massachusetts Appeals Court, which heard oral argument on April 11.

An expert in gang membership and violence, Jorja Leap, Ph.D., reviewed records regarding Mr. Maldonado's case and submitted a declaration, which has been provided to the Court under seal. She found that Mr. Maldonado's history includes numerous risk factors for gang membership. Declaration of Jorja Leap, Ph.D. ("Leap Declaration"), Exhibit 6 under seal ¶ 21. Membership in a gang provided support and protection that was lacking in his personal life. *Id.,* ¶ 24.



While Mr. Maldonado was detained in the 2016 drug case, his girlfriend gave birth to a daughter, who is now two years old. PSR, ¶ 56. In a letter to the Court, Sheyla Taína Toro, the mother of Mr. Maldonado's daughter, writes that Mr. Maldonado changed when her relationship with him began "because he learned the reality of having and feeling that love for his true family, which is us, my daughters and me." She describes him as someone "who never had support from his mother or family" but instead sought support from "the streets." Letter from Sheila Taína Toro, DE 23. Exhibit 2.

<u>Procedural History and Background</u>

Mr. Maldonado has pleaded guilty to a single-count indictment charging him with threatening to murder a federal prosecutor and his family.  (Mr. Maldonado entered a guilty plea at his arraignment on May 8, 2019; this Court accepted his plea at a Rule 11 hearing on May 22.)

The charge arises from a letter Mr. Maldonado sent to the prosecutor in his Springfield drug case in March of 2018.  In that case, Criminal No. 16-30038-MGM, Mr. Maldonado was charged with selling less than 11 grams of cocaine powder to an informant.  The same Assistant U.S. Attorney had prosecuted Mr. Maldonado in 2014 for four sales of heroin to an informant. The earlier case, Criminal No. 14-30034-MGM, involved a total of fewer than five grams of heroin.

 The prosecutor filed an information under 21 U.S.C. § 851 in the 2016 case and took the position that Mr. Maldonado was a career offender.  Mr. Maldonado's guideline sentencing range as a career offender, with a maximum sentence of 30 years, exceeded 15 years, even after a reduction for acceptance of responsibility.  At the time of sentencing, the Presentence Report calculated the guideline range as 210-262 months.  PSR in Criminal No. 16-30038-MGM, Exhibit 8 under seal, ¶ 81.  The non-career offender guidelines were 15-21 months.

On June 20, 2018, Mr. Maldonado offered to plead guilty to both the drug indictment and an information charging the threat.  *See* transcript, Criminal No. 18-30025-MGM, .DE 5, attached as Exhibit 2.  The Rule 11 hearing was aborted, however, when Mr. Maldonado indicated that he believed the government would recommend that the sentence for the threat case would run concurrent with his drug sentence and government counsel stated that it was not promising to make that recommendation.  *Id.* at 42-45.  The confusion largely resulted from

undersigned counsel's understanding of the government's position regarding the operation of the guidelines in the case. *Id*. at 42-43.

At a later status conference, undersigned counsel reported that government counsel on both cases were "unwilling to say at this point what their recommendation would be on a plea." Transcript, July 23, 2018, 18-30025-MGM, DE 10, attached as Exhibit 3, at 4. The prosecutor dismissed the threat information without prejudice. Criminal No. 18-30025-MGM, DE 9, 14.

The drug case was scheduled for trial. Judge Mastroianni disqualified the original prosecutor from that case, in light of the threat at issue in the instant case. Criminal No. 16-30038-MGM, DE 232.

Mr. Maldonado pled guilty to the 2016 drug case on October 23, 2018. Judge Mastroianni sentenced Mr. Maldonado on April 3, 2019 to 30 months of imprisonment and six years of supervised release. PSR, ¶ 35. He arrived at that sentence after concluding that Mr. Maldonado was not a career offender and that the base offense level for the drug charge was 12. *See* April 3, 2019 Transcript, 16-30038-MGM, DE 328, Exhibit 4, at 56-57. After deducting two points for acceptance of responsibility, Judge Mastroianni found the guideline range to be 15-21 months. The prosecutor recommended a sentence of 216 months, or 18 years, even after the judge rejected the career offender guideline. *Id.* at 74.

Judge Mastroianni varied upward to impose a 30-month term of imprisonment for the drug charge. The Court also imposed a 12-month consecutive sentence for the violation of supervised release in the 2014 case. The judge also imposed a six-year term of supervised release on the drug indictment; a key condition was that Mr. Maldonado reside in a residential treatment program upon his release from prison. Judge Mastroianni will hold a status conference

on June 27 – after this Court has imposed sentence – to determine what placements may be available.[2]

Undersigned counsel argued that the offense level for the drug case should be enhanced by two levels for obstruction of justice, as a result of the mailed threat to the prosecutor. The government had omitted that information from its statement of offense conduct, and neither the probation officer nor Judge Mastroianni included the obstruction enhancement in their guideline calculations. *See* Sentencing Transcript, Exhibit 4, at 12-24; *see also* Presentence Report, Criminal No. 16-30038-MGM, Exhibit 8 under seal, at 33-34.

The government obtained the instant indictment on April 25, little more than three weeks after the drug sentence was imposed. A month later, it filed a notice of appeal from the drug sentence. Criminal No. 16-30038-MGM, DE 334.

Circumstances of the Instant Offense

Mr. Maldonado wrote the letter that forms the basis of the instant charge after being held for approximately 18 months on an indictment charging him with selling 10 grams of cocaine powder to an informant for $600. During his detention, his girlfriend gave birth to his first child. At that time, he was in Wyatt Detention Center, in Central Falls, Rhode Island, where he remained for most of his detention. Other than his lawyers, no one visited him there. He only saw his daughter when her mother brought her to court.

Detention and isolation exacerbated Mr. Maldonado's long-standing mental illness. He knew that the government planned to seek a sentence of 15 to 20 years. Mr. Maldonado

---

[2] The status conference was postponed after undersigned counsel informed the Court that programs under consideration would not schedule an intake interview until after Mr. Maldonado's release date was determined. Judge Mastroianni therefore continued the conference to a date after the sentencing hearing in this case.

perceived the Assistant U.S. Attorney as having personal animus toward him. The prosecutor –
who brought the 2014 drug case against Mr. Maldonado – made comments vilifying the
defendant. At one point, in the presence of Mr. Maldonado and his lawyer, the prosecutor said
that he was going to "put [the prosecutor's] $2,000 cowboy boot up [Mr. Maldonado's ass]."
This information is included solely to provide the context for Mr. Maldonado's conduct and is
not in any way meant to blame the victim or justify Mr. Maldonado's actions.

Within two weeks of sending the letter to the prosecutor, Mr. Maldonado wrote a letter to
the court, apologizing to the prosecutor, his family, and the court. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

██████████████████████████████████████████████████
████████

████████████

In pleadings filed in response to the defendant's motion to recuse the prosecutor,[3]

government counsel acknowledged the apology. Government Opposition to Motion to Disqualify

---

[3] Defense counsel moved to recuse the prosecutor, based on the threat, on April 13, 2018.
Criminal No. 16-30038-MGM, DE 177. The government opposed the motion. Criminal No. 16-
30038-MGM, DE 191. At the time, the case was expected to be resolved by a guilty plea. Judge
Mastroianni denied the motion to recuse in an electronic order entered on May 9, 2018. Criminal
No. 16-30038-MGM, DE 195. When the case was scheduled for trial, undersigned counsel
moved for reconsideration. Criminal No. 16-30038-MGM, DE 218. The government again
opposed disqualification. Criminal No. 16-30038-MGM, DE 219. In a memorandum and order
entered on September 4, 2018, Judge Mastroianni allowed the motion for reconsideration and
ordered the prosecutor disqualified. Criminal No. 16-30038-MGM, DE 232.

Assistant U.S. Attorney ("Govt. Opp. Disqualify"), Criminal No. 16-30038-MGM, DE 191, at 3. The government described Mr. Maldonado's letter as "a short-lived emotional outburst that was limited to written words sent from a prison cell." *Id.* at 7. Government counsel wrote: "The defendant did not take any steps toward bringing the threat to fruition and it ended after three weeks with a written apology to "[the prosecutor] and his family." *Id. See also id.* at 9 ("the initial threat made by the defendant is no longer active and existed for only a brief period, as evidenced by the defendant's letter to this Court"). In its opposition to reconsideration of Judge Mastroianni's denial of the initial motion to disqualify the prosecutor, government counsel asserted, "[T]he threat no longer exists because the defendant has apologized in writing to [the prosecutor] and his family." Government Opposition to Motion to Reconsider Motion to Disqualify Assistant U.S. Attorney ("Govt. Opp. Reconsider"), Criminal No. 16-30038-MGM, DE 219 at 3.

The government argues in its sentencing memorandum that Mr. Maldonado's gang ties could have enabled him to carry out a threat to the prosecutor. Government Sentencing Memorandum ("Govt. Memo"), DE 24, at 2-3. But the government's investigation of this case included review of Mr. Maldonado's recorded telephone calls. It has pointed to no evidence that those calls included contact with known gang members or any effort to harm Mr. Newhouse.

The record in this case and in Criminal No. 16-30038-MGM demonstrate that Mr. Maldonado's purpose was to have Mr. Newhouse removed from his case. That is precisely the position that the government took in opposing defendant's motion to disqualify him. In its opposition to the motion to disqualify, the government wrote: "The defendant should not be permitted to benefit from his own bad conduct and *to manipulate who his prosecutor is*." Government Opp. Disqualify at 1 (emphasis added). *See also id.* at 3, 5-6.

## THE SENTENCING GUIDELINES

The Presentence Report calculates the guideline range as 27-33 months. PSR, ¶ 83. The government maintains that Mr. Maldonado should be classified as a career offender. PSR at 35-43. Defendant argues that Judge Mastroianni correctly concluded that the career offender guideline does not apply. Defendant submits that the guideline range should be 24-30 months.

## ARGUMENT

### I.     THE GUIDELINE RANGE SHOULD BE 24-30 MONTHS.

The letter that Mr. Maldonado sent to the prosecutor constituted obstruction of justice in that case. The government's first draft of the offense conduct in the drug case included a description of the letter but the final one omitted it. After we objected to the absence of the obstruction enhancement in the drug case, the probation officer responded, "As [the earlier version] was clearly a draft version of the statement *and this alleged conduct may be the basis of a new federal prosecution,* the Probation Department is not considering that conduct for purposes of this matter." PSR, Criminal No. 16-30038-MGM, Exhibit 8 under seal, at 33 (emphasis added). As we explained in our objection in the earlier case,

> Whether the conduct has or will result in additional charges is immaterial. Application note 1 to § 1B1.3 states, "Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator."

*Id*. at 32.

Judge Mastroianni overruled the defendant's argument that the obstruction enhancement be included in the drug case, explaining, "I agree with the government's position that as the prosecutorial body they have the choice as how to address conduct that is criminal and borders on relevant conduct or separately indictable offenses." Sentencing Transcript, Exhibit 4, at 24.

There is nothing in the guidelines, however, that permits a court to defer to a prosecutor's

assessment of what counts as relevant conduct.

As Judge O'Toole has written:

There are two principal reasons why the Guidelines call for consideration of "relevant conduct" in the sentencing judgment, one philosophical, one practical. The philosophical reason is to assure that the sentence properly accounts for all the "harms" actually caused by the defendant's offense, and only those harms. <u>See, e.g.,</u> U.S.S.G. ch. 1, pt. A, P 4(a), p.s. (1987) ("A pure real offense system would sentence on the basis of all identifiable conduct. A pure charge system would overlook some of the harms that did not constitute statutory elements of the offenses of which the defendant was convicted."). The practical reason is to diminish the opportunity for prosecutors to control the sentencing process by selective charging decisions. <u>Id.</u> ("The Commission also recognizes that a charge offense system has drawbacks of its own. One of the most important is its potential to turn over to the prosecutor the power to determine the sentence by increasing or decreasing the number (or content) of the counts in an indictment.").

*United States v. Quinn*, 472 F. Supp. 2d 104, 110 (D.Mass. 2007).

U.S.S.G. § 3C1.1 applies a two-level enhancement if "(1) the defendant willfully

**obstructed** or impeded, or attempted to **obstruct** or impede, the administration of justice with

respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and

(2) the **obstructive** conduct related to (A) the defendant's offense of conviction and any **relevant**

**conduct**; or (B) a closely related offense." The conduct at issue here clearly related to the drug

prosecution. Immediately after he sent the letter to the prosecutor, Mr. Maldonado admitted to

investigators from the US Marshals Service "that his intent behind the letter was to hopefully

have [the recipient] removed as the prosecutor of his upcoming trial."

While the guideline refers to conduct that obstructs the instant offense, its purpose would

be best served by applying it in this case. Nothing in the guideline prohibits application of the

enhancement in a threats prosecution. *Cf.* U.S.S.G. § 3C1.1, comment n.7 (listing offenses to

which obstruction does not apply). With that enhancement, the adjusted offense level would be

16, rather than 14. With a three-level reduction for acceptance of responsibility, the total offense level is 13. *See* PSR, ¶¶ 26-30.

If the drug case is relevant conduct to the instant offense, it cannot be included in the criminal history calculation. U.S.S.G. § 4A1.2, comment n.1. Thus, Mr. Maldonado's criminal history category would be IV, and his guideline range would be 24-30 months.

## II. THE SENTENCE APPLIED HERE SHOULD BE IMPOSED TO RUN CONCURRENTLY WITH MR. MALDONADO'S CURRENT SENTENCE, AND REDUCED TO REFLECT THE TIME THAT HE ALREADY HAS SERVED.

If the drug offense is considered relevant conduct to the instant offense, the guidelines dictate that the sentence in this case shall be adjusted to deduct the time already served on that prior sentence. U.S.S.G. § 5G1.3(b). In addition, "the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment." *Id.*

## III. IF THE DRUG CASE IS NOT DEEMED TO BE RELEVANT CONDUCT, THE COURT SHOULD CALCULATE THE APPROPRIATE TOTAL SENTENCE FOR THE DRUG AND THREAT CASES.

By choosing to forego the obstruction enhancement in the drug case and deferring prosecution of the instant case until after Judge Mastroianni sentenced Mr. Maldonado, the government has manipulated the application of the sentencing guidelines in this case.

If the two cases had been prosecuted together, Mr. Maldonado arguably would have received a two-level increase in his offense level under U.S.S.G. § 3C1.1 for the drug case. The government argues in its sentencing memorandum that the letter was not relevant conduct to the drug prosecution, characterizing Mr. Maldonado's statement to the Marshals as "self-serving." Govt. Memo, DE 24, at 8-9. But that contradicts the position that the government took in opposing Mr. Maldonado's motion to disqualify the prosecutor and the ultimately successful motion to reconsider the denial of that motion. In its opposition to the motion to disqualify, the

government wrote: "The defendant should not be permitted to benefit from his own bad conduct and *to manipulate who his prosecutor is*."  Government Opposition to   Motion to Disqualify, DE 191 at 1 (emphasis added).  *See also id.* at 3. The court, in ultimately ordering Mr. Newhouse disqualified, acknowledged this concern: "The court is thus sensitive to the risk of creating an incentive for a defendant to engage in such conduct for tactical reasons."  Memorandum and Order, DE 232, at 3.

This was the main point advanced by the government in opposing the motion to disqualify. Government counsel argued that "a defendant should not be able to threaten a prosecuting attorney and then move to disqualify the prosecutor based on the defendant's own reprehensible conduct.  That is precisely what the defendant is seeking to do in this case."  Govt. Opp. Reconsider, DE 219 at 2-3.  *See also* Govt. Opp. Disqualify, DE 199, at 5 ("a defendant cannot create a conflict by threatening a prosecutor").  The government at length quoted cases decrying such a tactic.  *Id.*  at 5-6, citing *inter alia*,  *Rhode Island v. McManus*, 941 A.2d 222, 232 (2008) ("prosecutor's disqualification would 'provide an incentive for defendants to engage in such unlawful conduct" and refusing to "sanction such a strategy"); *State v. Robinson*, 179 P.3d 1254, 1260 (NMCA 2008) ("as  a matter of policy, a defendant . . . cannot chose his or her prosecutor for an underlying offense by the use of threats"); *People v. Hall*, 499 N.E.2d 1335, 1347 (1986) ("to require … a substitution . . . would invite misconduct").

In ordering Mr. Newhouse disqualified, Judge Mastroianni referred to the drug case and potential threat prosecution as "two related cases against the same Defendant."  Memorandum and Order, DE 232 at 4,

Had the two cases been sentenced together and the obstruction enhancement applied to the drug case, the adjusted offense level for the drug case then would have been 14 and the two cases

would have been grouped together.  U.S.S.G. § 3D1.2(c).  The adjusted offense level would have been 14; with a two-level reduction for acceptance of responsibility, the total offense level would have been 12.  The guideline range in Criminal History IV would then have been 21-27 months.

In the alternative, if no obstruction enhancement were applied, two points would have been added to the adjusted offense level of 14 applicable to the threat charge. U.S.S.G. § 3D1.4.  The total offense level would have been 13, reflecting a three-level reduction for acceptance of responsibility.  The resulting guideline range would be 24-30 months in Criminal History Category IV.

The guidelines permit a downward departure in cases falling outside subsection (b), where appropriate to "ensure that the combined punishment is not increased unduly by the fortuity and timing of separate prosecutions."  Application note 4(E).  That is precisely the situation presented here.  To the extent that Mr. Maldonado may already have completed serving the sentence of imprisonment imposed on the drug charge, U.S.S.G. §5K2.23 permits a departure for a defendant who has completed a serving a term of imprisonment to which U.S.S.G. § 5K2.23 applies.

IV.     THE COURT SHOULD APPLY A VARIANCE TO IMPOSE A SENTENCE OF
        THREE MONTHS CONCURRENT WITH MR. MALDONADO'S EXISTING
        SENTENCE.

Regardless of whether the guidelines support a departure, this Court should vary from the guidelines in order to mitigate the effects of the timing of this prosecution and because a sentence of three months concurrent with the existing sentence is "sufficient but no greater than necessary" to serve the statutory purposes of sentencing.  18 U.S.C. § 3553(a).

A. <u>Circumstances of the offense</u>

As discussed above, Mr. Maldonado wrote the letter at a time when he was isolated from his loved ones and anxious about a possible sentence of more than 15 years for a $600 cocaine sale. ███████████████████████████████████████████████████████ ████████████ As the government argued in opposing disqualification of the prosecutor, the threat was a short-lived emotional outburst, for which Mr. Maldonado apologized within two weeks in a letter to the Court.

B. <u>Mr. Maldonado's background</u>



Mr. Maldonado, in short, grew up with significant physical and mental challenges and without meaningful family support. By the age of 12, he was on his own, going from foster homes into the custody of the Department of Youth Services. Records from DSS note the failure of DYS to provide any meaningful plan. PSR, ¶ 68.

It is clear that Mr. Maldonado's behavior was aggressive and disruptive. But the lack of proper treatment and support, along with the abuse he suffered, likely exacerbated his condition. Given the absence of any meaningful parental relationships, it is unsurprising that Mr. Maldonado became involved with gangs and substance abuse at an early age. *See* Leap Declaration.

C. Impact of prison

If Mr. Maldonado receives a long prison sentence, he likely will be placed in a maximum-security penitentiary where he will face constant threats of violence. His past gang ties and visible gang tattoos, PSR ¶¶ 59, 61, will make him more vulnerable. He will have to choose between being a victim or aggressor, and will need to rely on gang members for self-protection. In turn, he will be expected to participate in gang violence and activity. *See* Leap Declaration, ¶ 38.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

The failure of the Bureau of Prisons ("BOP") to adequately address the mental health needs of its inmates is well-documented. A report by the Inspector General in 2017 cited BOP data showing that, "as of 2015, only 3 percent of the BOP's sentenced inmate population was being treated regularly for mental illness." Office of Inspector General, Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness ii (2017) ("OIG Report"), available at https://oig.justice.gov/reports/2017/e1705.pdf. BOP's own report to Congress stated, however, "that approximately 19 percent of federal inmates had a history of mental illness. Moreover, a 2006 Bureau of Justice Statistics report concluded that 45 percent of federal inmates had symptoms or a recent history of mental illness." *Id.*

"In May 2014, the BOP issued a national policy requiring that all inmates receive mental health care commensurate with their needs, even while they are in restrictive housing."[4]  OIG report at 8. But the OIG report "found that the BOP has not provided sufficient resources, specifically with regard to the number of mental health staff, to implement the new policy." OIG Report at 37. After the new policy issued, the number of inmates classified as needing treatment declined approximately 30 percent, suggesting that "mental health staff at institutions may have reduced the number of inmates designated . . . to help alleviate increased work requirements associated with these care levels." *Id.* at 37.

The OIG report echoes Dr. Leap's and Dr. Leveroni's warnings about the effect of solitary confinement on prisoners' mental health.

> Research indicates that prolonged exposure to conditions of solitary confinement can result in psychological and psychiatric conditions, such as irritability, anger, aggression, and rage.  Inmates could also experience chronic insomnia, loss of control, panic attacks, paranoia, and hypersensitivity to noise, light, and smells.

*Id*. at 16.   In federal prisons, inmates placed in special housing units ("SHUS") "do not have out-of-cell programming opportunities and inmates' participation in group therapy would be discontinued during their SHU placement[.]" *Id*. at 18. Recreation opportunities can be limited and are not available on weekends to inmates in [restrictive housing units], and consequently inmates are confined to their cell for approximately 72 consecutive hours every weekend without any out-of-cell opportunities."  *Id.*

---

[4] BOP does not use the term "solitary confinement" and insists that it does not exist in federal prisons.  OIG report at 15. "Restrictive housing" is the term used by BOP to describe conditions akin to solitary confinement, including confinement to single cells for more than 22 hours and lack of participation in recreation with others.  *Id*. at 16.

Moreover, imprisonment "is only going to reinforce his gang involvement." Leap Declaration, ¶ 42. It "will completely destroy an opportunity for exiting all gang involvement and obtaining the mental health treatment he needs and equipping him to begin the process of rehabilitation and recovery." *Id.* at ¶ 43.

Mr. Maldonado renounced his gang membership after he was released from federal prison in 2015. PSR at 47, Objection #9. He reports that after his release from federal prison, he did not resume those contacts, as a result of the positive influence of his girlfriend. *Id.* Unfortunately, while incarcerated he has felt it necessary to renew those connections for his own protection. *Id.*

### D. Alternatives

One of the codefendants in Mr. Maldonado's 2006 case, Victor Colon, submitted a letter in support of Mr. Maldonado. Letter of Victor Colon, DE 23. Mr. Colon describes his experience of being imprisoned with Mr. Maldonado, and notes Mr. Maldonado's generosity toward other inmates. Mr. Colon, whose upbringing and background were similar to Mr. Maldonado's, now works as a harm reduction counselor, volunteering to help former prisoners. Mr. Colon expresses his belief that Mr. Maldonado "can become a productive member of society," and his willingness to help Mr. Maldonado achieve that goal.

If Mr. Maldonado is released, he will be motivated by his love for his girlfriend and child and will be free of the threats he faces in prison. *See* Leap Declaration, ¶ 48. An opportunity to address his longstanding substance abuse and mental health needs in a structured environment, assisted by his loved ones and others like Mr. Colon who have successfully made the same transition, will help protect the public.

A lengthy prison sentence likely will make Mr. Maldonado more dangerous and disturbed. When he is eventually released, he will have few if any supports and resources to cope with life in the community. Dr. Leap explains that imprisonment is not the answer; in fact, it will only aggravate Mr. Maldonado's mental condition and increase the likelihood of recidivism. Mr. Maldonado's acts of aggression in prison – all of them as part of group assaults – do not demonstrate the need for further imprisonment but instead reflect the pressures he faces while incarcerated. Notably, Mr. Maldonado's record does not include any allegations of domestic violence. No restraining orders have been taken out against him. Neither of his two federal drug cases involved firearms or other weapons.

## V.  MR. MALDONADO IS NOT A CAREER OFFENDER.

In its objections, the government argues that Mr. Maldonado should be classified as a career offender, based on his 2006 conviction in Hampden Superior Court for armed assault with intent to murder and his 2015 conviction in this Court for distribution of heroin. At issue is whether Mr. Maldonado's conviction as a joint venturer of armed assault with intent to murder qualifies as a crime of violence under U.S.S.G. § 4B1.2(a).

As has been previously noted, Judge Mastroianni decided that issue against the government; the government has filed a notice of appeal. This Court should defer to Judge Mastroianni's ruling. Had Judge Mastroianni not recused himself from this prosecution, he presumably would have reached the same conclusion in this case as he reached in the drug case: that Mr. Maldonado is not a career offender. The rationale behind the law of the case doctrine should be honored here.

In situations where a different member of the same court re-examines a prior ruling, "the law of the case doctrine . . . reflects the rightful expectation of litigants that a change of judges mid-way through a case will not mean going back to square one." *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997). The second judge may alter previous rulings in certain circumstances, but "he is not free to do so . . . merely because he has a different view of the law or the facts from the first judge." *Id.* (quoting *Williams v. C.I.R.*, 1 F.3d 502, 503 (7th Cir. 1993)). So, "the presumption is that earlier rulings will stand, even though it can be overcome for compelling reasons (such as new controlling law or clear error)." *Best*, 107 F.3d at 546.

*Mendenhall v. Mueller Streamline Co*., 419 F.3d 686, 691 (7th Cir. 2005).

The law of the case doctrine may not apply strictly in this case, where the issue arises in a different case number.  But the parties and the facts are the same.  The issue is a purely legal one that does not require fact-finding.  Having two judges reach two different legal conclusions as to the same defendant, on the same set of facts, would create a confusing record on appeal and require a remand as to at least one of the cases.  If this Court reaches the same conclusion as Judge Mastroianni, presumably the government will appeal.  If the Court of Appeals affirms the ruling, there will be no need for a remand.

As Judge Mastroianni held, the 2006 conviction should not count because it was based on joint venture – a Massachusetts variant of accomplice liability - theory. *See Commonwealth v. Maldonado*, 77 Mass. App. Court 1102 (2010), at * 1, attached as Exhibit 5. ("A jury found the defendant guilty, as a joint venturer, of armed assault with intent to murder").  At the time of his conviction, that liability was broader than required by federal aiding and ability.

A. At the time of Maldonado's Conviction, Massachusetts Joint Venture Liability was Broader than Federal Aiding and Abetting.

At the time that Mr. Maldonado was convicted of the armed assault, conviction under a joint venture theory in Massachusetts required proof that the defendant was

(1) present at the scene of the crime,

(2)  with knowledge that another intends to commit the crime or with intent to commit a crime, and

(3) by agreement is willing and available to help the other if necessary. *Commonwealth v. Bianco,* 388 Mass. 358, 363 (1983).

That formulation did not require proof that the defendant shared the principal's intent to commit the crime, substituting knowledge for shared intent. The third element – that the defendant is willing and available to help – is different from specific intent to commit the crime, since it only requires a willingness to assist but not a shared mens rea.

 In 2009, after Maldonado's conviction, the Supreme Judicial Court adopted "the language of aiding and abetting rather than joint venture" for use in future trials, requiring that juries be required to find as "essential elements: that the defendant knowingly participated in the commission of the crime charged and that the defendant had or shared the required criminal intent." *Commonwealth v. Zanetti*, 454 Mass. 449, 467 (2009).  Indeed, the Appeals Court decision in Maldonado's case acknowledged that the older formulation applied to his case. *Maldonado*, 77 Mass. App. Ct. 1102 (2010)(check cite), at *1 n.2, Exhibit 5.

The joint venture theory in effect at the time of Maldonado's conviction was broader than generic or federal aiding and abetting because it required only knowledge, rather than shared intent. *See United States v. Franklin*, 904 F.3d 793, 798 (9th Cir. 2018); *United States v. Valdivia-Flores*, 876 F.3d 1201 (9th Cir. 2017). In *Valdivia-Flores,* the Ninth Circuit held that a Washington state conviction for drug trafficking did not qualify as an aggravated felony under immigration law because the state's accomplice liability – incorporated into every statute – was broader than that provided under federal law. As explained in *Franklin*, in the context of the Armed Career Criminal Act, "it is possible to violate the Washington statute as an accomplice with knowledge but not intent concerning the perpetrator's criminal activity."  *Franklin*, 904 F.3d at 798. Federal law, on the other hand, "requires the government to prove an accomplice has

'specific intent' to facilitate the commission of a crime by someone else.'" *Id.* at 797, quoting *Valdivia-Flores* at 1207.

Massachusetts law in effect when Mr. Maldonado was convicted is similarly overbroad. Therefore, a conviction under the old version of Massachusetts joint venture cannot qualify as a conviction for aiding and abetting within the meaning of the commentary to § 4B1.1. Moreover, Massachusetts law in effect at the time of Maldonado's conviction – like the Washington law at issue in *Valdivia-Flores* – did not require a jury to be unanimous as to whether a conviction was based on principal or joint venture liability. *See Zanetti*, 454 Mass. at 464. Therefore, as was true in Washington, the statute is not divisible between the two theories and the modified categorical approach cannot be applied. *Valdivia-Flores*, 876 F.3d at 1210.

The government cites language from the Supreme Court's decision in *Gonzalez v. Duenas-Alvarez*, 549 U.S. 183 (2007) to suggest that, in assessing whether a state crime sweeps more broadly than its federal counterpart, "more than . . . legal imagination" is required. *Id.* at 193. The First Circuit has clarified that the cited passage does not permit a court to ignore the applicable law of the state in question:

> [T]hat sensible caution against crediting speculative assertions regarding the potentially sweeping scope of ambiguous state law crimes has no relevance to a case like this. The state crime at issue clearly does apply more broadly than the federally defined offense. Nothing in *Duenas-Alvarez*, therefore, indicates that this state law crime may be treated as if it is narrower than it plainly is. Nor are we aware of any circuit court case, whether from this circuit or from any other, that supports the [Board of Immigration Appeal's] surprising view that, in applying the categorical approach, state law crimes should not be given their plain meaning.

*Swaby v. Yates*, 847 F.3d 62, 66 (1ˢᵗ Cir. 2017). *Swaby* quoted the basic principle enunciated in *United States v. Fish,* 758 F.3d 1 (1ˢᵗ Cir. 2014): "A state's definition of a crime is overbroad if its elements allow for a conviction without satisfying the elements Congress has provided to define the required predicate offense." *Id.* at 6, cited in *Swaby* 847 F.3d at 66 n.2.

The government strains to argue that "the SJC has apparently required that the joint venture shares the principal's intent, at least where the underlying statute requires proof of intent[.]" PSR at 41. It relies primarily on three cases, none of which bear the weight that the government gives to them. *Zanetti* cited one of those, *Commonwealth v. Clemente,* 452 Mass. 295 (2008), as an example of a case that applied the earlier, flawed formulation of joint venture. *Zanetti*, 454 Mass. at 463 n.15.

The fact that, in deciding a specific case, a Massachusetts court used language that could be interpreted as finding a heightened intent does not undermine the fact that the law as it existed at the time of Mr. Maldonado's conviction *permitted* a conviction at a lower threshold. The government argues that pre-*Zanetti* joint venture appears to be "quite similar" to federal aiding and abetting and that there is "little difference" between the two. PSR at 42. This strained argument implicitly acknowledges that they are, in fact, distinguishable. No more is needed.

*Lassend* rested in part on the Supreme Court's pronouncement that "every jurisdiction – all states and the Federal Government – has 'expressly abrogated the distinction' between principals, aiders and abettors present at the scene of a crime and accessories before the fact." *Gonzalez v. Duenas-Alvarez*, 549 U.S. 183, 189-90 (2007) (internal citation omitted), quoted in *Lassend,* 898 F.3d at 132. But the Supreme Judicial Court recognized in *Zanetti* that Massachusetts "joint venture" was an outlier. *See id.*, 454 Mass. at 464-466. The court acknowledged that, although its prior decisions asserted that principal and joint venture liability were not separate theories, "we nevertheless continue to speak of them as such." The dissent went further, declaring, "In fact, the offenses are not the same at all. We have often recognized that criminal liability as a principal and criminal liability as an aider or abettor are conceptually different." *Id.,* at 472 (Cowin, J., dissenting).

B. Judge Mastroianni's ruling did not violate the categorical approach.

The government argues (as it did before Judge Mastroianni) that the Court should not even consider the fact that Mr. Maldonado was convicted on a joint venture theory because doing so would violate the categorical approach. PSR at 37-38, 39. This argument is a red herring. The government asserts that "aiding and ability liability . . . is not a separate offense from the underlying crime." *Id.* at 38. But in support of this, it cites federal cases, not Massachusetts ones. The Supreme Judicial Court recognized in *Commonwealth v. Zanetti,* 454 Mass. 449 (2009) – decided after Mr. Maldonado was tried and convicted – that "even after our declaration in [*Commonwealth v.*] *Santos* [408 Mass. 281, 290 (2003)], that principal and joint venture liability are not different theories of guilt, we continue to examined general verdicts as if they were[.]" *Zanetti*, 454 Mass. at 464-65. Thus, the law in effect at the time of Mr. Maldonado's conviction treated joint venture liability and principal liability as separate. Indeed, *Zanetti* recognized that the Massachusetts courts had, since 1983, "articulated a . . . formulaton of joint venture liability" without referring to the state's aiding and abetting statute and "without using the language of aiding and abetting[.]" *Id*. at 463. When a defendant is convicted under a joint venture or aiding and abetting theory, however, he or she has not engaged in the forceful, violent conduct that falls within the definition. *See Johnson v. United States ("Johnson I"),* 559 U.S. 133, 140 (2010) (defining force required as "*violent* force –that is, force capable of causing physical pain or injury to another person").

The government's claimed distinction between predicates falling under the force clause and those within the enumerated clause is unavailing. In *United States v. Starks*, 861 F.3d 306 (1st Cir. 2017), the First Circuit addressed the issue of whether Massachusetts robbery fell within the force clause of the Armed Career Criminal Act. It concluded that the Massachusetts

definition of the crime swept too broadly to qualify as a violent felony. *Id*. at 319-20. The court explained that, "even if most armed robberies are in fact violent, if a conviction can be obtained without proof of violent force, then the offense does not qualify as a violent felony under the ACCA's force clause." *Id.* at 315. The court made clear that the focus must remain on the minimum conduct required to sustain a conviction for the crime in question. *Id.*

The law of joint venture in Massachusetts before 2009 required only that a defendant be present with knowledge and the willingness to assist the principal. It thus modified the threshold for culpability, which in turn determines whether the definition of the crime is overly broad.

The government relies heavily on *Lassend v. United States*, 898 F.3d 115, 131 (1st Cir. 2018), in which the First Circuit has held that accomplice liability for a New York robbery falls within the force cause of the Armed Career Criminal Act, as narrowed by *Leocal v. Ashcroft*, 543 U.S. 1 (2004) and *Johnson I.. Lassend* 898 F.3d at 131. But *Lassend* does not apply to the career offender guidelines, only to the ACCA. And while the First Circuit generally has applied its decisions regarding the ACCA's definition of violent felonies to the career offender definition of crimes of violence, the distinction matters here. In *Lassend*, the Court looked to Congressional intent:

> If Congress had desired to preclude convictions from qualifying as ACCA predicates where the defendant acted as an accomplice and did not intend the principal's use of force, it would have done so clearly. Congress could have included an express intent requirement in the ACCA's force clause, as it did in other subsections of 18 U.S.C. § 924.

*Lassend,* 898 F.3d at 133.

No such congressional intent can be gleaned from the inclusion of aiding and ability liability in the commentary to U.S.S.G. § 4B1.2: unlike the guidelines themselves, the commentary is not submitted to Congress for approval and is not subject to the notice and

comment provisions applicable to the guidelines. *Stinson v. United States*, 508 U.S. 36, 41

(1993). That distinction calls into question whether aiding and abetting liability can be the basis

for a career offender predicate. Defendant notes that this issue – in the context of a drug case –

is pending before the First Circuit. *See United States v. Vaughn Lewis*, CA No. 18-1916.

## CONCLUSION

For the reasons set forth above, counsel asks the Court to impose a sentence of three

months of imprisonment, to run concurrent with the sentence he now is serving.

CARLOS MALDONADO
By his attorney,


*/s/ Miriam Conrad*

Miriam Conrad
B.B.O. # 550223
Federal Defender Office
51 Sleeper Street
Boston, MA  02210
Tel: 617-223-8061


## CERTIFICATE OF SERVICE

I, Miriam Conrad, hereby certify that the foregoing was filed through the Electronic
Court Filing system and will be sent electronically to the registered participants as identified on
the Notice of Electronic Filing on June 18, 2019.

/s/ *Miriam Conrad*